1                                          **Volume 5**

2                                      **Pages 735 - 761**

3                  UNITED STATES DISTRICT COURT

4                NORTHERN DISTRICT OF CALIFORNIA

5          BEFORE THE HONORABLE JEFFREY S. WHITE, JUDGE

6   ------------------------------)
                                  )
7   UNITED STATES OF AMERICA,     )
                                  )
8                   Plaintiff,    )
                                  )
9       v.                        )   No. CR. 10-376 (JSW)
                                  )
10  OSHAN COOK,                   )
                                  )
11                  Defendant.    )   San Francisco, California
                                  )   Thursday, July 26, 2012
12  ------------------------------)

13

14                  TRANSCRIPT OF PROCEEDINGS

15  APPEARANCES:

16  For Plaintiff:          MELINDA L. HAAG, Esq.
                            United States Attorney
17                          450 Golden Gate Avenue
                            San Francisco, California  94102
18                  BY:     CHINHAYI COLEMAN CADET
                            PETER B. AXELROD
19                          Assistant United States Attorney

20  For Defendant:          Law Offices of Doron Weinberg
                            523 Octavia Street
21                          San Francisco, California 94102
                    BY:     DORON WEINBERG
22
                            ALEXIS WILSON BRIGGS
23                          506 Broadway
                            San Francisco, California 94133

24

25

Thursday, July 26, 2012

(7:39 a.m.)

(Defendant present in court.)

(In open court; jury not present)

THE COURT:  Please call the case.

DEPUTY CLERK:  Calling Case Number Cr. 10-376,
United States vs. Oshan Cook.

Counsel, please state your appearances.

MR. AXELROD:  Pete Axelrod and Chinhayi Coleman
Cadet for the United States.

THE COURT:  Good morning.

MR. WEINBERG:  Doron Weinberg for Oshan Cook, who
is in person present.

THE COURT:  One just housekeeping type matter,
the CSO asked the Court if they could open the courtroom.
Of course they can and they should.  This is a public
proceeding, so --

LAW CLERK:  I just asked him to go back and make
sure jurors can get in.  I'll have the public file in
quietly.

THE COURT:  Thank you very much.

So good morning, everybody.  So what up?  To put
it in legal jargon here.  I've actually done a fair
amount -- I, meaning my law clerk and I, have done a lot
of research on this.  And there is one event I wanted to

1  put on the record.  We obviously, with the agreement of

2  both counsel, excused the jury for the evening at roughly

3  3 o'clock yesterday.  And when they went back into the

4  jury room -- and when my courtroom deputy clerk went back

5  to, she typically does, meaning the jack of all trades

6  went to empty their trash, saw that they were still

7  convened.  And they indicated that they had another note,

8  immediately, that they wanted to hand to my courtroom

9  deputy clerk, and my courtroom deputy clerk told them that

10  they should come back and whatever they wanted to do they

11  should do tomorrow.  Because they were officially excused.

12  And so whatever they did or wanted to do, I felt should

13  happen today.

14       But if they do present another note when they're

15  all here today, this morning, I wanted it clear on the

16  record that they, whatever they were going to communicate,

17  they were going to communicate yesterday after they were

18  officially excused by the Court, because the timing of

19  another note may be relevant, and I want -- of course, I

20  didn't want there to be any communications even by gesture

21  without disclosing it to counsel and the parties.

22       So we don't know what's going to happen.  They're

23  not all here yet.  And I brought you out, A, to tell you

24  that; and B, to kind of discuss a few what-ifs while we

25  had the benefit of time.  On the expectation that we're

1    going to get another note pretty quickly from the jury,

2    and also upon having had the opportunity to research where

3    we are right now, even assuming there is not another note,

4    I wanted to get the input of counsel and let you know what

5    I'm thinking about, how I'm thinking about approaching it.

6         So I know that Mr. Weinberg had left a message

7    saying he didn't have secretarial help and wanting to know

8    if we could e-mail the authorities, and I didn't get that

9    until this morning, so that may be moot. But I know the

10   government didn't file anything.

11        Is there anything that the government wants to

12   say in addition to what we were discussing yesterday?

13        MR. AXELROD: No. I think -- we have reviewed

14   the model instruction and the authorities that go with

15   that, and I think it's our view at this point that we need

16   to see what the jury presents to us. The Court obviously

17   excused the jury last night, they may come back today. It

18   sounds like they had some more thoughts. So we'll see if

19   we get a note, and depending on what the specifics of that

20   note are, if any, we'll address them.

21        But at this point, the government's view is, we

22   need to just sit and wait and see if having another night

23   to sit on things and reflect brings them to a different

24   place today. And they'll let us know where they are, and

25   we can figure out what the next step is. But at this

1    point we don't think any action is necessary.

2              THE COURT:  All right.

3              MR. WEINBERG:  I agree that it's premature for

4    action.  But logically, it seems to me -- I don't want to

5    speculate, unduly, but it seems to me, logically, that

6    note more likely than anything else was a note that said

7    there's no point in coming back tomorrow, we're

8    deadlocked.  Which is why they sat back down and -- I mean

9    that's the most likely thing they would have done in 5

10   minutes or 10 minutes.  So I think we should be ready

11   pretty soon to do whatever we're going to do next if they

12   do come back and say, Sorry, we're still deadlocked.

13             THE COURT:  I think that's a fair point.  And I

14   agree that although we -- the most we know right now is

15   that, from the jury's notes, is that they haven't reached

16   a verdict on any count, and as of yesterday, at 3:00, it

17   did not appear, you know, one way or the other that they

18   were hopelessly deadlocked, because the language was

19   somewhat ambiguous.

20             But the fact that they said, We haven't reached a

21   verdict on any count, and they're telling us that, and

22   then when I asked the question that you all agreed to,

23   Have you reached a verdict on any count, they said no,

24   there would -- one might speculate that there would be no

25   reason for them to tell me they hadn't reached a verdict

1    unless they felt they couldn't reach a verdict.

2           So let's leave it this way for now.  I don't

3    think we're at a point where the jury has told us that

4    they're hopelessly deadlocked, but let's assume we get,

5    without, you know, prejudice to anybody changing their

6    position, since we're all here and since I at least had

7    the benefit of looking at some Ninth Circuit authority on

8    this, I would like to talk about what do we do if they

9    come back and they say words to the effect of, you know,

10   Why did you make us come back?  We're hopelessly

11   deadlocked, or some words to the effect, that they are

12   hopelessly deadlocked, the -- just to share with you the

13   benefit of the Court's thinking and based upon some of the

14   authorities that I've looked at, and some of this is a

15   little bit of stream of consciousness, but it comes

16   together to some extent to what I think should happen

17   next, at least what I think should happen next.

18          And I started with a statement by the committee

19   of the Ninth Circuit on juries, they have a manual on jury

20   trial procedures, the Jury Instructions Committee, and

21   they say at page 132, and they cite a lot of Ninth Circuit

22   authority, I believe, upon receiving a communication from

23   a jury stating that it cannot agree, the trial court is

24   required to question the jury to determine independently

25   whether further deliberations might overcome the deadlock.

1    Questioning the foreperson individually and the jury

2    either individually or a group is satisfactory.

3         Another case says, another panel said, merely

4    questioning the jury foreperson may be insufficient.  So

5    that's just a technical detail.  And they even give -- and

6    this is sort of cutting to the chase here -- they even

7    give a practical suggestion.  They actually give you a

8    sort of a proposed colloquy with the jury which goes along

9    like this.  They call it "Procedure for determining if

10   jury is deadlocked," it's at page 134 of that same

11   document.

12        It says:  "Initially the Court may ask the

13   foreperson the following questions:  Is there anything

14   else the Court can do to assist in the jury's

15   deliberations?  Would an additional instruction assist in

16   your deliberations?  Would the reading of any testimony

17   help the jury reach a conclusion?"

18        And they go on to say:  "If the foreperson's

19   response to all three questions is no, then the Court

20   should ask, quote:  In your opinion, is the jury

21   hopelessly deadlocked?  If the foreperson's response is

22   yes, ask the foreperson:  Is there a reasonable

23   probability the jury can reach a unanimous verdict if sent

24   back to the jury room for further deliberation?  If the

25   foreperson's response is no, then ask the following

1    question of each member of the panel:  Do you feel there's

2    a reasonable probability that the jury can reach a

3    unanimous verdict if sent back to the jury for further

4    deliberation?"

5         And they also say the Court may wish to poll the

6    jury and record their answers, which must be yes or no.

7    And they say:  "Then the Court can make a determination

8    about what its next steps are."

9         And then there's a lot of cases, there are a

10   number of cases around this point, in the Ninth Circuit,

11   where the -- just sort of distilling it all, the Ninth

12   Circuit says one of the determinations to take into

13   account is a how long is the trial, how complex are the

14   issues, and how long have they been deliberating, in

15   proportion to the first two questions.  And that if --

16   unless the jury gives an indication that it is deadlocked,

17   it is inappropriate to do these inquiries because it may

18   make them deadlocked or may make a jury that's wavering go

19   one way or the other or be coercive.

20        This Court, having reviewed the authorities and

21   some of the statements of the Ninth Circuit and the

22   dictum, doesn't believe that the Allen charge is

23   appropriate in this case where we have very simple issues,

24   not a lot of testimony.  The jury has asked questions that

25   are pretty much right on point in terms of the way this

1    case was tried, in terms of specific issues and one count

2    being related to another count, and I'm persuaded to some

3    extent by the Ninth Circuit's most recent pronouncement in

4    the case of *U.S. vs. Evanston*, which is cited in 2011, and

5    that was the case where the judge inquired into the

6    reasons for the deadlock, what's holding up the jury, and

7    then let the -- reopened argument and let the parties

8    argue to the jury on those points, and the jury came back

9    about with a guilty verdict, and of course, the Ninth

10   Circuit reversed that as being coercive.

11        But in the course of that holding, the Ninth

12   Circuit said at page 1085 of this decision, which is

13   651 F.3rd 1080:  "Extraordinary caution must be exercised

14   when acting to break a jury deadlock.  This is

15   particularly true with respect to the Court's actions in

16   giving an Allen charge, which we have recognized is

17   already standing at the brink of impermissible coercion."

18   And they quote *U.S. vs. Seawell*, S-e-a-r-i-l-l (sic),

19   Searill (sic), 550 F.2d 1159 and 1162-63, decided in 1977

20   by the Ninth Circuit.

21        So obviously we're just speculating.  We don't

22   know what the jury's going to give us, but I would say

23   distilling all that, if we get a note that the jury's

24   deadlocked, I would propose to follow the colloquy that

25   the Ninth Circuit's committee on jury instructions

1    suggests and see where that takes us.

2           And interestingly enough, for obvious reasons

3    having to do with the right of appeal, most of these cases

4    come up in the context of the court deciding it's going to

5    grant a mistrial over the objection of the defendant.  And

6    so the defendant says, No, you know, I shouldn't have been

7    convicted, it was coercive, and, you know, you should, you

8    know, you should have done it a different way, as opposed

9    to granting a mistrial.

10          So let me just get -- starting with the

11   government, get your reaction to what I'm saying in terms

12   of that suggestion by the Ninth Circuit committee.

13          MR. AXELROD:  Well, so, just so I can track,

14   because I haven't reviewed the Ninth Circuit committee

15   instructions, the idea is to develop a factual record and

16   then make an assessment as to at that point whether any

17   further charging is appropriate?

18          THE COURT:  Correct.  For example, it's a fair

19   point, in that colloquy, although I think it's a little

20   ambiguous, if they say, Well, perhaps further instruction

21   from the Court might be appropriate, then the Court might

22   consider giving an Allen -- you know, the Allen charge

23   that the Ninth Circuit has approved.  But it would be to

24   not assume anything and to really make sure, in an

25   incremental basis, how deadlocked, if at all, the jury is.

1          MR. AXELROD:  Right.  That seems like a sensible

2     thing to do.  You know, I ask in part also because in the

3     cases that we reviewed, that process was not one that was

4     taken before the charge was given.  So -- or at least not

5     in the ones that I reviewed.  But it seems to make sense.

6          THE COURT:  Mr. Weinberg?

7          MR. WEINBERG:  I find it troubling, frankly, your

8     Honor.

9          THE COURT:  Which part?

10          MR. WEINBERG:  Well, the colloquy.  Because we're

11    not talking yet about giving an Allen charge and I think

12    we're trying to avoid that.

13          The two questions, if I heard them correctly,

14    that are troublesome to me are whether the Court can do

15    anything further to assist the deliberations and would

16    further instructions help.  We should only ask those

17    questions if we're willing to do what the jury wants, and

18    that's a slippery slope because if the jury says, Yeah,

19    well, we'd like to know more about such-and-such, and it's

20    an evidentiary point, whether or not we're going to give

21    them any more evidence.  And -- or we like such-and-such

22    addressed, we're not going to address it.

23          And if they say -- and I don't know what the

24    point of asking them about instructions is in a case in

25    which the Court has given them the written instructions

1    because I would object to changing or altering the

2    instructions at this point.  Most courts don't give the

3    jury the written instructions, or not every court gives

4    the jury written instructions, so I'm not sure that asking

5    those questions would do -- we'd either get a no, but if

6    we got a yes, I think we've opened a door we don't want to

7    walk through.

8            THE COURT:  Let me follow up with you on this.

9    Let me -- let's assume hypothetically that I agree with

10   you.  The -- what I would be strongly inclined to do -- in

11   fact, this seems to be almost in those cases where it was

12   error to grant a mistrial, the Court instructs the

13   District Court, that if the jury, quote-unquote, merely

14   says, We're deadlocked, the Court has a duty to poll them

15   in a yes/no type fashion so the Court doesn't get the

16   numerical scoring to jump right to the last point, which

17   is, assuming that the foreperson's answer to those

18   questions that Mr. Weinberg has concerns about, asked:  Is

19   there any reasonable probability that the jury can reach a

20   unanimous verdict if sent back to the jury room for

21   further deliberations?  If the foreperson says no, then I

22   would poll each juror, With a yes/no answer, do you agree

23   with that answer?  Not on your own behalf but on behalf of

24   the entire jury.

25            Because I don't want to get into the individual

1    standing, and then see what the answer is there.  If they

2    say -- if everybody says no, it might go one way,

3    depending upon what the parties are asking for or what

4    actions they're asking for or what the Court decides to

5    do.  And if they say yes, then perhaps an Allen charge is

6    appropriate or just tell them go back and deliberate, you

7    know, and see what happens in light of -- because -- at

8    least the process has credibility and the Court has

9    credibility.

10           If they say, No, we don't think -- a particular

11   juror says, I don't think the jury is hopelessly

12   deadlocked, if I then said, I'll send you back, they'll at

13   least know why I did it as opposed to, it may be the case

14   last night when we sent them home or yesterday afternoon,

15   that they were angry about why are we doing this, in light

16   of not having made it clear.

17           That's a modification that I might make because,

18   again, I just saw this for the first time early this

19   morning, and didn't fully think about it.  And I think the

20   point that defense counsel makes is well taken.  Be

21   careful what you ask for.  Because when -- if they say,

22   Yeah, we want all the testimony reread, and we say, Well,

23   you can't do that, and I think then you get into other

24   problems as well.

25           Let's see what happens.  I'll adjourn until we

```
1    hear.  It's a few minutes before 8:00, the jury may be
2    here.  Assuming -- if there's a note that comes out -- if
3    no note comes out I think we are where we were yesterday,
4    and we'll just continue to let them deliberate.  If a note
5    comes out, I'll come out and we'll see where we go from
6    there.
7              MR. AXELROD:  Thank you, your Honor.
8              MR. WEINBERG:  Thank you, your Honor.
9              THE COURT:  All right.  See you.
10             (Recess)
11             (Jury note received at 8:29 a.m.)
12             DEPUTY CLERK:  Remain seated and come to order.
13   Court's again in session.
14             THE COURT:  All right.  So counsel's present; the
15   defendant is present.
16             We received another note from the jury dated 7/26
17   at 8:29 a.m., signed by foreperson, which says the
18   following:  "The jury has completed deliberations and
19   cannot come to a unanimous verdict on any of these four
20   counts in the indictment."
21             So, based upon our previous discussion, there's
22   two options at this point.  One is to bring the jury out
23   and query them, based upon what we discussed before, but
24   starting with the colloquy concerning whether the jury's
25   hopelessly deadlocked.  The other alternative is to simply
```

1    declare a deadlock at this point without querying the

2    jury, because it might just be a futile act to do it at

3    this point given the record and the questions that have

4    been asked.

5         What's the government's position?

6         MR. AXELROD:  Well, I do think that we should ask

7    the jury -- I mean, this note is clear.  But I think it

8    would be appropriate to make inquiry to flesh out the

9    record and just confirm -- I mean this is the note from

10   the foreperson speaking, but I think it would be

11   appropriate to ask the questions.  So option 1.

12        THE COURT:  All right.

13        MR. WEINBERG:  It just seems to me that the

14   foreperson chose her words very carefully this time, given

15   our ambiguity the last time, and the fact that she used

16   the phrase "completed deliberations" is a clear message,

17   so I think it would be futile to bring them out here and

18   question them, but it's up to the Court.

19        THE COURT:  Let me ask, what's the defendant's --

20   is the defendant asking the Court to take any action if,

21   upon bringing the jury out, they confirm each one on

22   behalf of the entire jury that they are hopelessly

23   deadlocked, what is the -- what action, if any, is the

24   defendant asking the Court to take?

25        MR. WEINBERG:  I don't know that it's the

1    defendant asking the Court.  I think the Court would have

2    no choice but to declare a mistrial.

3          THE COURT:  All right.  And the defendant would

4    have no objection to that?

5          MR. WEINBERG:  Under the circumstances, no.

6          THE COURT:  All right.  And I assume the

7    government wouldn't either.  Or shouldn't I assume that.

8          MR. AXELROD:  You know, I think that this note

9    says what it says, and they're, you know, saying they

10   can't reach a verdict.  They sort of jumped a few steps

11   ahead of where we were earlier, I think, you know, without

12   the benefit of additional discussion, but you know, that's

13   where we are.  So I think that's why I'd like to see what

14   the jury, you know, has to say to just confirm this.

15         THE COURT:  All right.  And one thing, what I

16   will do is -- I don't typically do this, but I don't get

17   many hung juries, either -- I'm going to encourage them,

18   if they choose -- obviously this has to do with whether

19   they talk to counsel, that they have the right to refuse

20   to talk to counsel -- if they wish to talk to counsel,

21   they may do so.  And in these circumstances, where there

22   is a hung jury, there may be a benefit to the process and

23   to the system to talking to counsel, and even revealing --

24   I'm talking about if the Court decides to discharge the

25   jury, obviously -- to revealing where the jury, without

1    telling who the individuals were, what the numerical

2    standing of the jury was so that the parties can make

3    appropriate determinations as to what may or may not be

4    the appropriate next step.

5            Do you agree with that, Mr. Axelrod?

6            MR. AXELROD:  To inquire -- assuming that you

7    were to declare a mistrial?

8            THE COURT:  Yes.

9            MR. AXELROD:  And then ask that question?

10           THE COURT:  Not ask the question but urge them to

11   talk to counsel.

12           MR. AXELROD:  Absolutely.

13           THE COURT:  Do you agree with that?

14           MR. WEINBERG:  Agreed.

15           THE COURT:  Okay.  Let's get the jury in then.

16           DEPUTY CLERK:  All rise for the jury.

17           (The jury enters the courtroom.)

18           THE COURT:  Please be seated.

19           Good morning, everybody.  Ladies and gentlemen of

20   the jury, the Court has and the parties have received your

21   latest note as well as the rest of your notes, and there

22   is a procedure that the Court will follow in light of the

23   last note that you have issued or sent out to the Court.

24           So I'd like to start by asking for the foreperson

25   to please rise.  Good morning.

1          THE FOREPERSON:  Good morning.

2          THE COURT:  What I'm going to do, just so you

3    know, I'm going to ask the foreperson some questions, a

4    question, and then maybe more than one question, and then

5    I'm going to ask other questions to each member of the

6    jury panel.  And that's the proper procedure to follow

7    here.

8          So madam foreperson, in your opinion, is the jury

9    hopelessly deadlocked?

10          THE FOREPERSON:  Yes, sir.

11          THE COURT:  Is there a reasonable probability

12    that the jury can reach a unanimous verdict if sent back

13    to the jury room for further deliberations?

14          THE FOREPERSON:  No, your Honor.

15          THE COURT:  Thank you very much.

16          Let me start with, I'll skip the foreperson

17    because I've already asked the questions, I'm going to go

18    to each juror and ask the following questions.  I'd ask

19    you to please stand when I ask the question.

20          So Juror Number 1, good morning.

21          JUROR NUMBER 1:  Good morning.

22          THE COURT:  Do you feel that there's a reasonable

23    probability that the jury can reach a unanimous verdict if

24    sent back to the jury room for further deliberations?

25          JUROR NUMBER 1:  No, your Honor.

1          THE COURT:  Thank you very much.

2          Juror Number 2.  Do you feel there's a reasonable

3   probability that the jury can reach a unanimous verdict if

4   sent back to the jury room for further deliberation?

5          JUROR NUMBER 2:  No.

6          THE COURT:  Juror Number 3, do you feel there's a

7   reasonable probability that the jury can reach a unanimous

8   verdict if sent back to the jury room for further

9   deliberation?

10         JUROR NUMBER 3:  No, your Honor.

11         THE COURT:  Next person.  Juror Number 4, good

12  morning.

13         JUROR NUMBER 4:  Good morning.

14         THE COURT:  Do you feel there's a reasonable

15  probability that the jury can reach a unanimous verdict if

16  sent back to the jury room for further deliberation?

17         JUROR NUMBER 4:  No, your Honor.

18         THE COURT:  Juror Number 5.  Good morning.  Do

19  you feel there is a reasonable probability that the jury

20  can reach a unanimous verdict if sent back to the jury

21  room for further deliberation?

22         JUROR NUMBER 5:  No, your Honor.

23         THE COURT:  Juror Number 6.  Good morning.

24         JUROR NUMBER 6:  Good morning.

25         THE COURT:  Do you feel there's a reasonable

```
1    probability the jury can reach a unanimous verdict if sent

2    back to the jury room for further deliberation?

3              JUROR NUMBER 6:  No, your Honor.

4              THE COURT:  Juror Number 7.  That's you.  Good

5    morning.  Do you feel there's a reasonable probability

6    that the jury can reach a unanimous verdict if sent back

7    to the jury room for further deliberation?

8              JUROR NUMBER 7:  No, your Honor.

9              THE COURT:  Juror Number 9.  Do you feel there's

10   a reasonable probability that the jury can reach a

11   unanimous verdict if sent back to the jury room for

12   further deliberation?

13             JUROR NUMBER 9:  No, your Honor.

14             THE COURT:  Juror Number 10.  Do you feel -- good

15   morning.

16             JUROR NUMBER 10:  Good morning.

17             THE COURT:  Do you feel there's a reasonable

18   probability that the jury can reach a unanimous verdict if

19   sent back to the jury room for further deliberation?

20             JUROR NUMBER 10:  No, your Honor.

21             THE COURT:  Juror Number 11.  Good morning.  Do

22   you feel there's a reasonable probability that the jury

23   can reach a unanimous verdict if sent back to the jury

24   room for further deliberation?

25             JUROR NUMBER 11:  No, your Honor.
```

1          THE COURT:  And Juror Number 12.  Good morning.

2          JUROR NUMBER 12:  Good morning.

3          THE COURT:  Do you feel there's a reasonable

4   probability that the jury can reach a unanimous verdict if

5   sent back to the jury room for further deliberation?

6          JUROR NUMBER 12:  No, your Honor.

7          THE COURT:  Thank you very much.

8          Anything further that counsel wishes me -- the

9   Court to inquire?

10          MR. AXELROD:  No, your Honor.

11          MR. WEINBERG:  No.

12          THE COURT:  So at this point, ladies and

13   gentlemen, what I'm going to do is, which is what the law

14   allows or even requires in a situation like this, the

15   Court is going to declare a mistrial and hereby does

16   declare a mistrial, and just associated with that, and

17   finds that there's a manifest necessity to declare a

18   mistrial, in the interest of justice, require that the

19   Court declare a mistrial.

20          And upon doing that, I'm going to be just

21   momentarily discharging you and saying that the Court

22   never comments on the ultimate determination that a jury

23   makes or doesn't make because that's uniquely your

24   responsibility, your job, and there's no right answer,

25   there's no wrong answer.  Whatever did you is right

```
 1    because that's what -- you are the jury.  You're the

 2    judges of the facts.  So the Court never comments on

 3    anything that a jury does.

 4          But the Court does want to say that on behalf of

 5    the Court and the judicial system and the parties, the

 6    Court wants to thank you for your hard work, you were very

 7    diligent, you were punctual, and you even laughed at my

 8    jokes, which, you know, shows that it's good to have a

 9    captive audience, but seriously, you've really shown that

10    you are -- took what the Court said seriously in your

11    duties as a citizen and you've done your duties as

12    citizens.

13          Now, before I finally excuse you -- and by the

14    way, this has to do with excusing you, once I excuse you,

15    obviously you're free to go, you're free to discuss the

16    case with anybody you want.  Now you can do research.  All

17    the things I told you you can't do, LinkedIn and all those

18    other things that I can't remember, but they're all

19    important, you can do.

20          But one important thing is, frequently at the end

21    of a case, whether there's a verdict or as in this case

22    not a verdict, counsel wishes to talk to the -- to you.

23    And you have -- I always tell jurors that they are free to

24    discuss the case with counsel or not.  It's up to them,

25    obviously.  In a case like this where there has been --
```

1    the jury has not agreed on a verdict, I think it's

2    important to the system and important to the parties to

3    know if any or all of the jurors are willing to tell the

4    lawyers, after I discharge you, what was the ultimate

5    numerical breakdown -- and I would caution you against,

6    unless you want to, it's up to you, talking about what

7    your particular position was.  And the reason for that is,

8    parties, once a case is over in this fashion, have to make

9    the decision, as does the Court, on whether the case is

10   going to be tried again.  And the level of agreement or

11   disagreement numerically or otherwise that the jury has

12   experienced is a -- may be a guiding factor for the

13   parties.

14           So what I will do is, we'll leave the courtroom

15   open, and if you wish -- after you go back to the jury

16   room, if you wish to leave, you can leave.  If you wish to

17   talk to counsel either now or at a later time, or now, you

18   can come back into the courtroom and I'll allow you to

19   talk to counsel as short or as long as you want with the

20   understanding that it's up to you and you're free to say

21   whatever you wish to say.

22           And we had very high quality, very highly

23   professional and ethical counsel in this case, and in some

24   sense you may be spoiled because you actually saw very

25   good counsel trying a case at the highest level of the

1    system and their profession.  So there's no fear of

2    anything improper happening here with these lawyers.  Feel

3    free to say whatever you want.

4            But the Court does very, very profoundly want to

5    thank each of you.  I know this was -- I know this was a

6    great hardship for some of you.  And somewhat of a

7    hardship for others.  But I hope you feel like this is a

8    learning experience for you in terms of how does the

9    system operate, how is it supposed to operate, and why we

10   do what we do, and why our system is unique in the world

11   for the system we have of having everyday citizens, peers,

12   if you will, of the parties, of the defendant, deciding

13   these important factors and not leading into judges or

14   people who are appointed or elected.  It's a very

15   important part of our system and what makes our country

16   great.

17           Thank you very much for your service, and you're

18   now excused and discharged.

19           And if you wish to come back in the courtroom,

20   counsel will wait for you for a reasonable period of time.

21           (The jury exits the courtroom.)

22           THE COURT:  Counsel, would you come back to

23   counsel table.  I want to make sure that the responses of

24   the jurors represent their juror numbers and not their

25   seat numbers.  I think they're the same.  They're not the

1   same.  The court reporter is nodding yes.

2           Please, silence, please.  We're still in session.

3           All right.  A couple of housekeeping points.

4           The first is I would order that all of the

5   exhibits be returned to the government since they're all

6   government exhibits.

7           The second thing is, I would like to set a status

8   within -- I'll ask the government and defense counsel,

9   mostly the government, how much time you would need to

10  figure out what the government would like to do next, and

11  then come back here on a regular Thursday --

12          Oh, Mr. Cook, you're here.  Thank you (he came

13  back in room).

14          -- and decide how long we should wait for a

15  status.

16          What's your position, Mr. Axelrod?

17          MR. AXELROD:  What we'd like to do is come back

18  next Thursday and decide how to proceed.

19          THE COURT:  All right.

20          MR. WEINBERG:  Let me just check my calendar.  I

21  could be here by 2:30 on Thursday.

22          THE COURT:  Let me ask, Miss Ottolini, do we have

23  matters on calendar?

24          DEPUTY CLERK:  We do have matters on our

25  calendar.  I believe we have enough to keep us busy.

```
1            THE COURT:  All right.  So that's fine, 2:30 is
2   fine for this case.  And I would ask that next Wednesday,
3   24 hours in advance, the government file either a joint
4   status or separate status so the Court -- if there's going
5   to be a matter of scheduling, then I'll be able to talk to
6   my staff about when would be appropriate.  In other words,
7   for example, one alternative is the government believes
8   that it can and should try this case again, then either
9   we're going to -- we'll set a trial date and pretrial, or
10  to the extent that the defendant feels that's not
11  appropriate, as a matter of law, then you can set a
12  briefing schedule.  But I'd like to get a sense from the
13  parties of what their respective positions are so that I
14  can plan for it at least 24 hours in advance.
15            So is that acceptable to the government?
16            MR. AXELROD:  Yes, it is, your Honor.
17            THE COURT:  And to the defense?
18            MR. WEINBERG:  Sure.
19            THE COURT:  Anything further from the government?
20            MR. AXELROD:  No, your Honor.  Thank you.
21            MR. WEINBERG:  No, your Honor.
22            THE COURT:  And once again, I want to compliment
23  counsel for trying excellent cases on both sides.  It was
24  done very well, and these things happen and that's why we
25  have a jury system, and we'll see where we go from here.
```

1        Thank you very much.

2                    MR. AXELROD:   Thank you.

3                (Adjourned)

4                                 oOo

5

6

7

8

9

10

11

12                    CERTIFICATE OF REPORTER

13

14        I, Connie Kuhl, Official Reporter for the United
        States Court, Northern District of California, hereby
        certify that the foregoing proceedings were reported by
15        me, a certified shorthand reporter, and were thereafter
        transcribed under my direction into written form.

16

17        _____

18                    Connie Kuhl, RMR, CRR
                    Monday, August 6, 2012

19

20

21

22

23

24

25